**SHAPLEIGH et al. v. MIER.**

No. 7989.

Circuit Court of Appeals, Fifth Circuit.

April 30, 1936.

H. R. Gamble, of El Paso, Tex., for appellants.

Walter S. Howe and Richard F. Burges, both of El Paso, Tex., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The appellants, as citizens of the state of Missouri, sued the appellee as a citizen of Mexico, at law in an action of trespass to try title to 337 acres of land in Hudspeth county, Tex., known as Guayuco Banco No. 319, alleging that their rights grew directly out of the treaty of 1905 between the United States and Mexico (35 Stat. 1863). A plea of not guilty was entered. Jury was waived, and issues of fact as well as of law were submitted to the court. On July 5, 1935, a general judgment for the defendant was rendered with a memorandum offering to make specific findings of fact and conclusions of law. On October 4th, during the same term, such were filed. No party contending otherwise, we consider that the waiver of jury was under 28 U.S.C.A. § 773, and that the findings of fact are to have the effect of a special verdict as provided thereby. Since there are no rulings on demurrers, according to 28 U.S.C.A. § 875, review upon appeal is confined to rulings of the court in the progress of the trial if excepted to at the time and duly presented by a bill of exceptions, and to the question whether the facts specially found support the judgment. The power of the appellate court is restricted within these limits. Lewellyn v. Electric Reduction Co., 275 U.S. 243, 48 S.Ct. 63, 72 L.Ed. 262; Fleischmann Const. Co. v. United States, 270 U.S. 349, 46 S.Ct. 284, 70 L.Ed. 624; Harvey Co. v. Malley, 288 U.S. 415, 416, 53 S.Ct. 426, 77 L.Ed. 866; Eastman Kodak Co. v. Gray, 292 U.S. 332, 54 S.Ct. 722, 78 L.Ed. 1291. The bill of exceptions shows numerous objections to evidence which were overruled in the final judgment and exception allowed, but none of these are assigned as error. There was no motion by appellants for a judgment on the facts generally or for the finding of any special facts, but only a general exception taken to the judgment rendered. This last, if necessary, suffices to raise the question whether the facts as found support the judgment, and assignments of error properly follow it up. Other assignments that the court erred in finding numerous special facts we cannot consider because of the prohibition of section 875. We are bound to accept the facts as found.

Those material to be discussed are in brief as follows: Guayuco Banco was cut from Mexico into the United States during the year 1926 by a change in the course of the boundary river, Rio Grande, under provisions of the Treaty signed March 20, 1905, and proclaimed June 5, 1907, between Mexico and the United States, 35 Stat. 1863. The plaintiffs had a record title to a very large tract of land in Mexico which included the Banco prior to and at the time of the adoption of the Mexican Constitution of 1917, but had no actual possession and no prescriptive title; and only one of them had a permit as a foreigner to own land in the border zone in which this land lay. The Constitution of 1917 required the states of the Mexican Republic, including the state of Chihuahua where this land lay, to pass agrarian laws to compel the division of large landed estates, and on May 25, 1922, the state of Chihuahua enacted such a law. Under it the Governor of Chihuahua undertook to expropriate the plaintiffs' lands along with others by proceedings which were in all respects regular and in accordance with the law and the Constitution of 1917. The plaintiffs and their pred-

ecessors in title were notified of the expropriation proceedings and given opportunity to comply with the agrarian law and failed to do so. They were represented by counsel in the proceedings, but failed to comply with the orders of the Governor to present proof of their title and their right to own land within the prohibited zone. The expropriation was proclaimed by the Governor March 5, 1925. By virtue of these proceedings plaintiffs became divested of any and all title they may have had to the lands in controversy. The agrarian law of Chihuahua has been held valid and constitutional by the courts of last resort of the United States of Mexico, and the superior courts of Chihuahua. The state of Chihuahua was vested with jurisdiction and sovereignty over the land in controversy at the proclamation of the Constitution of 1917 and at the time of the expropriation proceedings. The Constitution of 1917 and the agrarian law do not require that compensation be paid prior to or at the time of expropriation, or that payment be then provided for. Claims for compensation under those laws must be urged and collected in the courts of Mexico, which have jurisdiction to determine the amount thereof and who is entitled thereto. Plaintiffs presented to the International Claims Commission of the United States and Mexico (43 Stat. 1730) a claim for restitution of the lands and for damages. Their title passed to and vested in the state of Chihuahua on March 5, 1925. On March 14, 1925, defendant filed proper application to the state of Chihuahua to purchase lands, including those in controversy, and thereby acquired a right and interest in them. The lands in controversy were thereafter cut off into the United States by the applicable treaties and by a decision of the International Boundary Commission promulgated March 30, 1930, and dominion and jurisdiction over them passed to the United States of America, giving the District Court jurisdiction over a controversy involving title to them. The plaintiffs are foreigners to Mexico and the defendant is a Mexican citizen.

The former treaties with Mexico followed the usual rule that where gradual changes occur in the course of the bounding river the boundary will follow the river, but not in cases of avulsion. The treaty proclaimed June 5, 1907 (35 Stat. 1863), made the river the boundary also as to "Bancos" theretofore or thereafter created by avulsion unless they were of an area of over 250 hectares or were populated by over two hundred souls, and the Boundary Commission was to determine the status of each Banco and mark it out on the ground. Article 4 gave the option to an inhabitant of a Banco thus transferred to remain on it or to remove, to keep his property or dispose of it, and to retain his old citizenship or to acquire that of the country to which he was transferred. By the principles of international law, also, the private ownership of the land would not ordinarily be affected by a treaty change to another sovereignty. United States v. Chaves, 159 U.S. 452, at page 457, 16 S.Ct. 57, 40 L.Ed. 215; United States v. Percheman, 7 Pet. 51, at page 86, 8 L.Ed. 604. The sovereignty and jurisdiction of the United States and the state of Texas in their respective spheres were established by the treaty and action of the Boundary Commission touching the Guayuco Banco; and the corresponding power and duty of the state and federal courts also attached to adjudge private rights and to award possession of the land. The District Court had jurisdiction of the case.

But from the pleadings and the findings of fact it appears that the controversy is between citizens of the United States and a citizen of Mexico, and really turns upon the validity of an act of expropriation done by the Governor of Chihuahua while the land was a part of that state under authority of a new Constitution of the Republic of Mexico. While in a trespass to try title the plaintiffs must recover on the strength of their own title, its validity is here relatively unimportant since the claim is that whatever their title may have been it was extinguished by the expropriation proceedings and transferred to the state of Chihuahua, the defendant connecting himself with the title of that state by at least an inchoate grant from it to him as its citizen. If the expropriation is valid, or not questionable, the plaintiffs cannot prevail. We are of opinion that the expropriation must stand as a fait accompli whose validity or justice may not be inquired into by a court of this country, but only by the department of our government charged with the conduct of foreign relations. The great object of the agrarian provisions of the Mexican Constitution of 1917 was to

take up and regrant the land held in immense tracts by a few owners, a condition which had resulted in the impoverishment and oppression of the masses of citizens. Irrespective of the finding as a fact of the constitutionality of the law of Chihuahua under which the Governor acted and the regularity of his proceedings thereunder, he did act under color of the Constitution and the law, and being the chief executive of the state of Chihuahua his sequestration in behalf of his state of the large body of land of which that in controversy is a part can be nothing else than an act of government within its own domain. Although this part of the property seized has passed into the hands of a grantee and has come within the jurisdiction of the United States, the correctness and justness of the seizure will not be inquired into by our courts because of international misunderstandings that might be engendered, but such questions are to be handled through diplomatic channels only. Oetgen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Ricaud v. American Metal Co., 246 U.S. 304, 305, 38 S.Ct. 312, 62 L.Ed. 733. That American citizens claim to have been mistreated does not confer jurisdiction, but rather emphasizes the necessity of judicial abstention from the controversy. The courts, as ruled in the cited cases, have jurisdiction to try the title to the property, but must treat as valid the governmental action within its domains by a foreign state. It may be added that on March 1, 1924, the United States in recognition of their diplomatic character entered into a treaty with Mexico for the settlement by an International Commission of Claims such as this one (43 Stat. 1730), and plaintiffs filed their claim with that Commission. Article 8 provided that all claims, whether filed or not, should be considered as settled and barred, provided that a claim filed has been heard and decided. There is testimony but no finding that this claim though filed was left undecided by the Commission at its dissolution. If we may thus look beyond the findings, we think that the failure of the Commission to decide the claim does not have the effect of remitting it to the courts, but rather to the department of state.

▮▮▮▮ But it is earnestly argued that land now within the United States is involved, and that a court of the United States in adjudicating its title should judicially recognize the law of Mexico applicable to the land, and so doing should hold that an expropriation without concurrent payment of compensation was when it happened and still is unconstitutional and void under the Mexican Constitution of 1917. It is true that where a large territory with its inhabitants is transferred by conquest or by treaty to a new sovereignty that the municipal law of the old sovereignty remains with it until altered by the new, as "the law of the land." The courts afterwards sitting in such territory continue judicially to recognize and apply that law as a part of the law of the forum. Fremont v. United States, 17 How. 542, at page 556, 15 L.Ed. 241; United States v. Perot, 98 U.S. 428, 25 L.Ed. 251; United States v. Chaves, 159 U.S. 452, 16 S.Ct. 57, 40 L.Ed. 215. But we think the principle has no application to the transfer by the movement of a river of a few acres of land from one sovereignty to another. The law of Mexico up to the date of such transfer does not thereby become a part of the lex fori. It remains foreign law to be proven as a fact when written by production of copies of the Constitution and statutes, and in other respects by the testimony of experts. The writings are to be construed by the judge as other writings in evidence, but if uncertain in meaning or application evidence of experts is again admissible to aid the construction.. Talbot v. Seeman (The Amelia), 1 Cranch, 1, 2 L.Ed. 15; Pierce v. Indseth, 106 U.S. 546, at page 551, 1 S.Ct. 418, 27 L.Ed. 254; Liverpool Steam Co. v. Phoenix Ins. Co., 129 U.S. 397, at page 445, 9 S.Ct. 469, 32 L.Ed. 788; Slater v. Mexican National R. Co., 194 U.S. 120, 121, 24 S.Ct. 581, 48 L.Ed. 900. Any other rule would not work, for the judge could hardly be truly conversant with the law of Mexico and would have no access to the means of information commonly used to ascertain the law of the forum; and if he were free, as in case of taking judicial notice, to consult any book or person in his discretion, the parties litigant would have no means of knowing what he relied on and no sure means of putting the truth before him. In the present case the Mexican Constitution and statutes were put in evidence. Questions as to their meaning and application were fully discussed by expert witnesses of both sides who contradicted one another widely. We are of opinion that the Mexican law and

its application to this case was a question of fact and rightly disposed of as such by the District Judge, if he had any right to go into the question at all. We are bound by his findings. Upon the main question, most nearly one of law, to wit, whether the Constitution of 1917 in its provision "Private property shall not be expropriated except for reasons of public utility and by means of indemnification" requires indemnification to be paid before or at the time of expropriation, we are cited to five decisions of the Supreme Court of Mexico that indemnifications is a matter to be adjudged in court proceedings after expropriation. We have no access to them, which illustrates the impossibility of our judicially noticing Mexican law, but we are told that five such concurrent decisions in Mexico settle a point of law, and we are prepared to believe it. Whatever possibility there may be of recovery by appellants of compensation in the Mexican courts, or of the land by diplomatic process, we think no error appears in the action of the District Court.

Judgment affirmed.